UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | DOCKET NO.   2:22-cr-85-JDL |
| | ) | |
| TRAVIS KIMBALL | ) | |

**DEFENDANT TRAVIS KIMBALL'S SENTENCING MEMORANDUM**

Travis Kimball respectfully submits this Memorandum in support of his position that a twenty-year sentence of imprisonment, followed by ten years of supervised release with the standard and recommended special conditions delineated in the Revised Presentence Investigation Report ("PSR") (ECF No. 53), is appropriate in this case. This sentence is "sufficient but not greater than necessary" based on application of the sentencing factors set out in 18 U.S.C. § 3553(a). The proposed thirty-year sentence punishes, provides deterrence, protects society, and allows for desired rehabilitation.

I.   INTRODUCTION

There is no question in Travis' mind about the seriousness of his offenses. He knows that his actions were unconscionable, and he has never minimized the magnitude of the harm he has caused to his victims, their families (which includes his own), and the community. The purpose of this Memorandum is not to excuse Travis' conduct. He has never once done that since his arrest, and he never will.

This is the first time Travis has ever been in trouble. After his arrest, he did not know whether he should seek release from confinement because he was worried that his release would signal a lack of accountability. Ultimately, he realized that getting treatment in counseling in the

1

community would be in everyone's best interest because he wanted to understand his conduct and develop the tools to prevent future offending. No such counseling was available at the jail, so he pursued release. He maintained steadfast adherence to his conditions of supervision, and he navigated the bureaucracy of MaineCare to obtain approval for counseling sessions *twice* a week. His counselor, Erica Joyce, LCSW, LADC, CCS, ABD-DSW, writes:

> Mr. Kimball has not once made excuses for his behaviors. He has been accountable from the beginning. He has admitted remorse and shame and 'wanting to fix his brain.' He does acknowledge causing unknown damage by his behaviors, which he has never denied in treatment.[1]

Ms. Joyce adds:

> He does not like who he is as a person based on what he has done. He wants treatment and help. While not minimizing Mr. Kimball's offense, his case shows unique qualities…He is an accountable, honest young adult. He has a significant history of trauma, has empathy, appears intelligent, has a strong support system, shows insight and wants to ensure he never reoffends.[2]

This is a complex case involving very serious conduct committed by a young man who was victimized as a child himself, and who has otherwise lived an exemplary life. Noted author, law school professor and Senior U.S. District Judge Jed S. Rankoff once wrote that the federal Sentencing Guidelines reduce a human being to "the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (Rakoff, J.), *aff'd*, 747 F.3d 111 (2d Cir. 2014). But Congress and the Supreme Court have given judges the power to consider *all* of the characteristics of an offender to impose sentences that are neither mechanical nor two-dimensional. *See United States v. Booker*, 543 U.S. 220 (2005); *Rita v. United States*, 127 S. Ct. 2456 (2007); *Gall v. United*

---

[1] Def.'s Ex. 1 – Letter from Erica Joyce, LCSW, LADC, CCS, ABD-DSW, dated January 4, 2023 at 1.
[2] *Id.* at 2.

*States*, 128 S. Ct. 586 (2007); *Kimbrough v. United State*s, 128 S. Ct. 558 (2007). 18 U.S.C. §3553(a)(1). And the ultimate command of Congress is, after considering the purposes of sentencing, to impose a sentence that is "sufficient, but not greater than necessary." 18 U.S.C. §3553(a). This is the so-called "parsimony provision," which requires district courts to impose the *minimum* punishment needed to satisfy the purposes of sentencing—just punishment, deterrence, protection of the public and rehabilitation of the defendant.

As reflected in the PSR, and numerous letters of support, Travis' crimes represent a marked deviation from an otherwise law-abiding life in which he selflessly devoted a huge amount of time and effort to a wide variety of socially beneficial activities. His strength of character, his significant support system, his motivation to heal himself and rehabilitate are attributes that increase the likelihood that Travis can again become a productive, non-threatening member of society. Thus, more severe punishment than that which is proposed herein is unwarranted.

II.     THE ADVISORY SENTENCING GUIDELINES ARE NOT IN DISPUTE.

The parties agree with the following guideline calculation contained in the PSR:

|  | COUNT 1– MINOR CHILD 1 | COUNT 4– MINOR CHILD 2 |
|---|---|---|
| **BASE OFFENSE LEVEL** | 32 | 32 |
| **MINOR UNDER 12** | +4 | +4 |
| **SEXUAL ACT OR CONTACT** | +2 | +2 |
| **DISTRIBUTION** | +2 |  |
| **TODDLER** |  | +4 |

3

|  |  |  |
|---|---|---|
| **CUSTODY, CARE, OR SUPERVISORY CONTROL** | +2 | +2 |
| **ADJUSTED OFFENSE LEVEL** | 42 | 44 |

| | |
|---|---|
| **MULTIPLE COUNT ADJUSTMENT** | +2 |
| **COMBINE ADJUSTED OFFENSE LEVEL** | 46 |
| **CHAPTER 4 ENHANCEMENT** | +5 |
| **ACCEPTANCE** | -3 |
| **TOTAL** | 48 |
| **CHAPTER 5 ADJUSTMENT** | -5 |
| **TOTAL OFFENSE LEVEL** | 43 |

The parties also agree that because Travis has no criminal history whatsoever, he is a Criminal History Category I. The resulting advisory sentencing range is life. PSR ¶ 77. However, because the maximum term of imprisonment authorized by 18 U.S.C. § 2251(e) for each count is 30 years, Travis' advisory guideline range is 720 months (60 years).[3] *Id.*

### III. THERE ARE NO UNRESOLVED OBJECTIONS TO THE PSR.

The Government filed no objections to the contents of the PSR. At the time of the Pre-Sentence Conference on April 12, 2023, the only unresolved objection by the defense related to Paragraph 64. Since that conference, the Government has advised that it will not pursue the

---

3 Note, however, that the PSR erroneously indicates that the combined 60-year statutory maximum term of imprisonment equates to 719 months. PSR ¶ 77.

information contained in Paragraph 64 or ask the Court to consider it in fashioning a sentence. Therefore, there are no unresolved objections to the PSR.

## IV. GIVEN TRAVIS' HISTORY, CHARACTER, AND COMMITMENT TO REHABILITATION, A VARIANT SENTENCE IS WARRANTED.

Travis is a twenty-two-year-old young man whose childhood was marked by difficulties, including instances of sexual abuse involving anal penetration by his mother's ex-boyfriend, severe emotional and physical abuse by his two older brothers, and his parents' acrimonious separation, divorce, and alienation of affection. Because of these adverse childhood experiences, Travis is diagnosed with posttraumatic stress disorder.[4] Travis' childhood trauma is a significant factor for the Court to consider in determining his sentence, as are his positive character traits, contributions to the community, strong support system, age, and vulnerability in prison, as discussed below.

### A. TRAVIS' CHILDHOOD TRAUMA IMPAIRED HIS MENTAL AND EMOTIONAL HEALTH.

i. "The primary effect of divorce (and of the parental conflict that precedes the divorce) is a decline in the relationship between parent and child."[5]

During the Presentence Interview, Travis identified his parents' divorce as "one of his worst childhood memories." PSR ¶ 62. He recalls that during the fighting leading up to the divorce and after the dissolution of the marriage, both of his parents became "emotionally absent" and very "shut down." PSR ¶ 59. Diminished emotional connection between divorced parents and their

---

4 Def.'s Ex. 1 at 1.
5 Marripedia, *Effects of Divorce on Family Relationships*, found at https://marripedia.org/effects_of_divorce_on_family_relationships#fn__12, citing Meneghan, E., et al., *Social Sources of Change in Children's Home Environments: The Effects of Parental Occupational Experiences and Family Conditions,* JOURNAL OF MARRIAGE AND FAMILY 57, 69-84 (1995); Amato, P., et al., *Feeling Caught Between Parents: Adult Children's Relations with Parents and Subjective Well-Being*, JOURNAL OF MARRIAGE AND FAMILY 68, no. 1, 231 (2006).

children is not uncommon, and research demonstrates that parental divorce interferes with a child's ability to trust the parents.[6,7] Travis recalls that after the divorce, if he tried to share his feelings about something that was bothering him, his parents would not respond with empathy. Instead, their responses made Travis feel like he had done something wrong by discussing his feelings, or that he was trying to make them feel guilty. In other words, Travis was emotionally abandoned by his parents, so he learned not share his feelings with them.

### ii. Travis was afraid and embarrassed to tell his parents that he was sexually abused.

After his parents' divorce, when Travis was about eight years old, he awoke in the middle of the night to a sharp pain. The room was dark, and it took him a moment to realize that an adult male was behind him. Travis was being sodomized. He stayed as still and as quiet as he possibly could. He did not understand what was happening to him. He did not know about "sexual abuse." The man ejaculated and left the room. Travis stayed still and silent. Approximately one week later, the same thing happened again. Travis stayed still and silent.

There are a multitude of reasons why Travis did not tell anyone about what happened to him. No one had explained "sex" to him; intimate topics were not discussed openly in his household. No one had discussed sexual abuse with him, or "good touch, bad touch." He simply did not understand what happened to him or that it was wrong and criminal. He did not feel emotionally safe to tell his mother, father or brothers what happened. PSR ¶ 62. He also did not

---

6 *Id., citing* Amato, P., et al., *A Generation at Risk*, HARVARD UNIVERSITY PRESS 69 (1997); Cooney, T., et al, *Support from Parents Over the Life Course: The Adult Child's Perspective*, SOCIAL FORCES 71, 63-83. (1991).
7 *Id., citing* King, V., *Parental Divorce and Interpersonal Trust in Adult Offspring*, JOURNAL OF MARRIAGE AND THE FAMILY 64, no.3, 642 (2002).

want to upset or disappoint his mother, and he continues to be very protective of her. In fact, during the Presentence Interview with U.S. Probation, Travis could not bring himself to disclose the identity of his abuser because he did not want his mother to overhear him naming his perpetrator. *Id.* He also did not want his father to blame his mother for what happened to him. Even when family members voiced their suspicions about Travis' perpetrator and his seemingly unusual interest in Travis' sibling, Travis was too afraid to say that it was him who had been molested.

### iii. Research suggests that Travis' own victimization played a significant role in his offense.

"Trauma disrupts our relationship with ourselves, our bodies, our minds, our very beings. It interrupts our ability to relate to others. Trauma destroys our ability to trust others, to trust our thoughts, or to trust our bodies."[8] Given his diagnosis, it is evident that childhood trauma disrupted Travis' mind and body, and his ability to trust. The first time Travis ever felt safe enough to disclose his own sexual victimization to anyone was last year in counseling with Ms. Joyce. Until then, Travis had repressed what happened to him.

We will never know whether Travis' underlying offenses could have been prevented had he disclosed his abuse and received proper and timely therapy. Certainly, not all victims of childhood sexual abuse become perpetrators themselves. But there is empirical evidence to suggest that sexual trauma begets sexual trauma, that the intergenerational "cycle of abuse" is very real. In one study, researchers found that among 747 men studied, "the risk of being a perpetrator was positively correlated with reported sexual abuse victim experiences. The overall rate of having been a victim was 35 percent for perpetrators and 11 percent for non-perpetrators…Having been

---

8  Ackerman, A., et al., *Healing from Sexual Violence: The Case for Vicarious Restorative Justice*, 33-34 (2019).

a victim was a strong predictor of becoming a perpetrator…"[9] Another study found that people who are sexually abused in childhood are 2.6 times more likely to become perpetrators of child sexual abuse between the ages of 21-31.[10] Indeed, Travis was 21 years old when he committed the instant offenses. Studies suggest that his own victimization (and lack of subsequent treatment) likely contributed to his criminal conduct. This is a significant mitigating factor.

> iv. "Sibling abuse is known as the 'hidden' or 'forgotten' abuse, but it's very real and has lasting effects."[11]

Growing up, Travis' older brothers subjected him to physical and verbal abuse, insults and manipulation. An example of the violence inflicted upon Travis by his siblings includes being force-fed the family dog's medication when he was two years old, causing Travis to lose consciousness. PSR ¶ 61. He was rushed to the local hospital where he had to have his stomach pumped. He nearly died. *Id.* On another occasion, when Travis was ten, one of his brothers threw a hatchet at him that lodged into his right leg. *Id.* The physical abuse continued throughout high school, and on at least one occasion, when Travis was beaten by one of his older brothers, the police intervened. *Id.*

Travis did not fault his brothers then, nor does he fault them now. He has always chosen to look past his own emotional distress to empathize with his brothers' emotional and mental health plights. At his core, Travis is a nurturer, a protector. His mother writes:

> Travis is a caring and supportive member of our family and always has been. He has always been one to defend others when he sees wrongdoing. When his older twin brothers

---

9 Glasser, M., et al., *Cycle of Child Sexual Abuse: Links Between Being a Victim and Becoming a Perpetrator*, BRITISH JOURNAL OF PSYCHIATRY 179, (2001).
10 Thornberry TP, et al., *Breaking the cycle of maltreatment: The role of safe, stable, and nurturing relationships*, J ADOLESCENT HEALTH, 53, S28 (2013).
11 Lebow, H., *How Sibling Abuse Can Affect Survivors*, PSYCHCENTRAL (July 14, 2022), found at https://psychcentral.com/ptsd/sibling-abuse-ptsd.

8

were being bullied at school and on the bus, he was the one to step in and try to put a stop to it when the school did not. He was willing to speak up to kids older and/or bigger than himself, in order to protect his sibling from further bullying.[12]

### B. TRAVIS HAS LED AN OTHERWISE PRAISEWORTHY LIFE.

As reflected in the PSR and multiple letters of support, Travis has significant redeeming qualities that mitigate his offense conduct and increase the likelihood that he can again become a productive, non-threatening member of society.

   i.  **No prior criminal history.**

Travis has lived an otherwise honorable and responsible life. He is obedient and has no criminal history whatsoever. Because a defendant with a minor criminal history, or a significant but old criminal history, can still fall within CHC I, considering Travis' lack of any criminal history whatsoever is a proper mitigating factor in the § 3553(a) analysis. *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (holding probation reasonable in child pornography case where defendant had no criminal history). Travis also maintained steadfast adherence to his conditions of release which were onerous. PSR § 6.

   ii. **"Travis is a caring and supportive member of our family and always has been."**[13]

Travis is a dedicated brother, son, and grandson, and he has a strong circle of support, many of whom are expected to be present at his sentencing. His mother Michelle writes:

> When my father was sick and dying, Travis took time off from work and bought plane tickets for himself and one of his brothers to go to Florida to be with their grandfather and the rest of the family… Travis is never shy to step up and help when needed. He knew that his brother wanted to be in Florida with the rest of us but could not afford the plane ticket; Travis never thought anything but to buy a ticket for his brother along with his…

---

12  Def.'s Ex. 2 – Letter of support by Michelle Kimball, May 30, 2023.
13  *Id.*

9

> I understand the seriousness of the charges against Travis, but I also know that this alone does not define Travis. We feel that we have a great support system surrounding him and will do anything that is needed through this process. Throughout his life, Travis has tried to be someone that others look up to and is currently taking online classes in order to better himself. I ask for your mercy in sentencing him; taking into account his age, this being the first time he has ever been in any sort of trouble with the law, his huge support system backing him, and his own drive to be a productive member of society. I feel that with counseling and working through his sentence, he will have no problem reentering society and not reoffending.[14]

His grandmother Jane writes:

> As Travis was a child, he spent many nights and weekends with his grandfather and I. He was always eager to learn new things in the garage. Travis learned how to weld and work on car motors; this has carried over to adulthood and helping his family working on our vehicles when he could. At about 8 years old, he learned how to use the riding lawnmower and would mow our lawn, rake, and help with my flower garden…He is supportive and helpful in anything I need. He cleaned our garage out by himself; it needed to be done but I could not do it myself. He took over all household chores such as mopping and sweeping as he knew it was difficult for me with my bad back. Being his grandmother, my hope for Travis is he gets counseling to work through all of this and be able to take classes so he is prepared for his release. Travis is very smart and wants to be mentally and physically healthy and a productive member of society. My hope is that I am still alive when he gets out as I am 82 years old; I beg you for leniency.[15]

A family friend writes:

> I have been a friend of the family for many years…I got to know Travis even better this past year while he was staying with Jane Lewis on pretrial release. I would stop by to see Jane and visit with them for a while. Travis would be sweeping floors and mopping them. He would be dusting other cabinets and shelves. I am happy for Jane that he was there to help her; I wish I had someone to do that for me. Travis liked to cook; he would make all their meals for them and even baked sweets. He even baked cupcakes and gave me four of them for my birthday…Travis was always polite any time I was there visiting. If anyone asked him to do anything, he would do it for them. . I feel that with counseling he will come out a better young man and have no problem being productive in society. We beg you for leniency in sentencing him.[16]

From another family friend:

---

14  *Id.*
15  Def.'s Ex. 3 – Letter of support from Jane Lewis, June 6, 2023.
16  Def.'s Ex.4 – Letter of support from Donna Tripp, June 1, 2023.

> [W]hile Travis was under house arrest, residing at his grandmother's, he would help me up the front stairs and again down when leaving, always being helpful and considerate. He also did a lot of the housework and other day-to-day things that his grandmother would need...I feel that with proper treatment and counseling Travis Kimball can become a successful member of society.[17]

### iii. "He likes assisting in the community and seeing how he can help others; this has always been a passion for him."[18]

When Travis was in elementary school, he was selected by a school counselor to participate in a program for young boys who demonstrated good character despite adversity. The program enabled Travis to attend one week of summer camp on Lake Sebago at Camp O-AT-KA, a non-profit organization whose mission was, "Building strong boys is better than mending broken men." He thrived at camp, and because of his good behavior that first summer, he was invited to return every year on scholarship until he aged out of the program when he was sixteen. At that point, he applied for and was accepted into the counselor-in-training (CIT) program at Camp O-AT-KA, and after successfully completing the CIT program, worked as a camp counselor for the next five summers. He was very dedicated to the camp and often worked on a volunteer basis in the off-season to help with maintenance projects and various promotional events. Giving back to the place that had given him so many skills, values and warm memories was very important to Travis, as was being a positive role model for the campers. And his efforts did not go unnoticed.

Steve Moss, the Head of Archery and CIT Advisor writes:

> Travis, when I first met him, epitomized the success of the mission. I first encountered him one evening in the camp library, where he was helping a young counselor deal with a personal situation that was interfering with his effectiveness. Travis was open, direct, transparent, insightful and empathetic… As the season went on, I saw Travis around camp in many different situations. In every one of them, he was helping somebody. I can't say

---

17 Def.'s Ex.5 -- Letter of support from Helen McKay, May 20, 2023.
18 Def.'s Ex. 1.

this about anybody else in the camp.[19]

Outside of camp, Travis strived to give back to the greater community by volunteering with the Paris Fire Department and the American Red Cross. PSR ¶ 74. He also helped one of his high school teachers who ran a dog kennel and training school. *Id.*

### C. TRAVIS IS A "YOUTHFUL OFFENDER."[20]

Neuroscience informs that people may not gain full reasoning skills and abilities until the average age of twenty-five.[21] This implicates the issue of culpability in young offenders whose brains have not fully developed. Travis was twenty-one when he committed the instant offenses. Research suggests that Travis' frontal lobe was not fully developed at the time of his criminal conduct.[22] The frontal lobe is considered the behavioral and emotional control center of the brain. It is home to areas that manage thinking, judgment, and self-control. Thus, if the frontal lobe is undeveloped, then an individual is susceptible to immature and irresponsible behavior, and poor impulse control.

The Supreme Court has recognized that given the susceptibility of juveniles to immature and irresponsible behavior, "their irresponsible conduct is not as morally reprehensible as that of an adult." *Roper v. Simmons*, 543 U.S. 551, 553, 125 S. Ct. 1183, 1186 (2005) (internal citation omitted). This attribute diminishes the penological justifications for imposing the harshest sentences on youthful offenders, even when they commit terrible crimes. *Miller v. Alabama,* 567 U.S. 460, 472, 132 S.Ct. 2455, 2465 (2012). "Because "'[t]he heart of the retribution rationale'"

---

19  Def.'s Ex. 6 – Letter of support from Steve Moss, PhD, June 1, 2023.
20  United States Sentencing Commission, *Youthful Offenders in the Federal System* at 5 (May 2017).
21  *Id.*
22  *Id*. at 7.

relates to an offender's blameworthiness, "'the case for retribution is not as strong with a minor as with an adult.'" *Id.* (internal citations omitted).

Travis' young age is a significant mitigating factor in this case.

### D. VULNERABILITY IN PRISON.

Vulnerability in prison is recognized as a factor the court may consider in crafting an appropriate sentence. *Koon v. U.S.*, 518 U.S. 81 (1996) (police officers convicted of civil rights crimes); *U.S. v. Gonzalez*, 945 F.2d 525 (2d Cir. 1991) (departure affirmed for defendant who had "softness of features" which would make him prey to prisoners); *U.S. v. Lara*, 905 F.2d 599 (2d Cir. 1990) (departure from 10 to 5 years upheld for defendant whose youthful appearance and bisexuality made him particularly vulnerable to victimization, a factor not adequately considered by the Guidelines); *U.S. v. Long*, 977 F.2d 1264 (8th Cir. 1992) (court departed from 46 months to one year home detention based on potential victimization in prison); *U.S. v. Parish*, 308 F.3d 1025 (9th Cir. 2002) (eight level departure granted in child pornography case in part because defendant had "high susceptibility to abuse in prison" due to his demeanor, his naiveté, and the nature of the offense); *U.S. v. Wilke*, 995 F. Supp. 828 (N.D. Ill. 1998) (downward departure based on appearance and conviction of child pornography offense would subject him to physical abuse in prison); *U.S. v. Ruff*, 998 F. Supp. 1351 (M.D. Ala. 1998) (Ruff would be especially vulnerable to sexual victimization in prison).

Travis' vulnerability in prison is clear. He is young. As reflected in the PSR, individuals between the ages of 22 and 25 make up only 4.6% of the population in the Bureau of Prisons. PSR ¶ 95. He is naïve, inexperienced, and has never been to prison. His voice is high-pitched and he has a "baby face" when clean shaven. Most significantly, his offense makes him a target of threats

and violence, which has been an issue during his detention at two local jails. When Travis' guilty plea was reported in the local news, a corrections officer laid a newspaper down in an inmate common area with Travis' story front and center. Travis was subsequently cornered by several inmates and threatened. Luckily, an inmate with a large build and clout among the others sympathized with Travis and prevented others from assaulting him. He regularly receives death threats from other inmates. There can be no dispute that Travis will be in serious risk of violence or even death at the Bureau of Prisons.

### V. TWENTY YEARS OF INCARCERATION FOLLOWED BY TEN YEARS OF SUPERVISED RELEASE SATISFIES THE PURPOSES OF SENTENCING.

The seriousness of Travis' offenses are without question. Twenty years of imprisonment followed by ten years of supervised release, likewise, is a serious sentence that promotes respect for the law and reflects just punishment. This is Travis' first encounter with the criminal justice system. He has no history of aggressive or non-compliant behavior, particularly with law enforcement or authority figures. He was cooperative with the investigators in this case, and he was successful on pretrial release. He had a positive attitude towards his supervising officer and the justice system. He has had no disciplinary issues in jail during the pendency of this case. He has demonstrated with words and actions acceptance of responsibly for his offenses.

In assessing just punishment, several factors are significant. First, Travis' offense precludes him from earning time credits authorized by the First Step Act of 2018 ("FSA Time Credits"). 18 U.S.C. § 3632(d)(4)(D). Because he is not eligible for FSA Time Credits, he will receive the most minimal credit for good behavior. He will not be prioritized for Evidence-Based Recidivism Reduction Programs or Productive Activities. Therefore, his experience in federal prison will be much harsher than that of an inmate with the same sentence for a non-disqualifying offense.

Second, because he will be a target of violence, Travis will likely serve his sentence in protective custody where the inmates are confined to their cells twenty-three hours/day. Third, Travis' conviction, in and of itself, is a severe penalty because it will make him a felon and a convicted sex offender. The stigma of a felony conviction is permanent and pervasive. It will irreparably damage his reputation. It disqualifies him from multiple fields of employment, including finance, healthcare, and education. He can never serve on a federal jury and he will be prohibited from voting in some states. He can never possess a firearm for the rest of his life, and his ability to explore the world beyond the United States will be significantly curtailed. Travis will also be required to register as a sex offender, which often causes the listed person to become so socially ostracized that he has difficulty living and working in many communities.

Furthermore, while incarceration is qualitatively more severe than supervision in the community, supervised release is an onerous punishment that will substantially restrict Travis' liberty. Travis' conditions require him to engage in sex offender treatment and submit to periodic polygraph examinations; he is barred from associating or having any communication with persons under the age of eighteen except in limited circumstances approved by his probation officer; his employment must be approved by his probation officer and he is barred from a job requiring contact with children; he is barred from places where children are likely to be, such as parks, schools, playgrounds, and childcare facilities; he is barred from viewing any pornography whatsoever; he is not permitted to travel outside the State of Maine without prior approval; he is required to participate in mental health treatment; and he is barred from using any computer except for work, or, without approval, any other electronic media—such as a personal digital assistant or cellular phone—with internet capability.

In sum, a sentence greater than that which is proposed herein is not necessary to reflect the seriousness of Travis' offense, to promote respect for the law, or to achieve just punishment. Twenty years in prison followed by ten years of supervision in the community, coupled with mandatory sex offender registration also adequately protects the public and provides adequate deterrence.

And finally, the court must impose a sentence that promotes Travis' rehabilitation.

> [The goal of rehabilitation] cannot be served if a defendant can look forward to nothing beyond imprisonment. Hope is the necessary condition of mankind, for we are all created in the image of God. A judge should be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life. Punishment should not be more severe than that necessary to satisfy the goals of punishment.

*United States v. Carvajal*, No. 04 CR 222AKH, 2005 WL 476125, at *6 (S.D.N.Y. Feb. 22, 2005). Society needs Travis to rehabilitate, and rehabilitation requires him to have hope. A twenty-year term of imprisonment will confine Travis for almost as long as he has been alive, but it will not destroy all hope for a decent, productive life. He deserves punishment, but he also deserves a meaningful second chance. To lay a foundation for his rehabilitation upon release from prison, we ask the court to recommend Travis to FMC Devens so he can receive treatment for his mental health and sex offender counseling.

Dated:   June 8, 2023

Respectfully submitted,

/s/Heather Gonzales, Esq.
Attorney for Defendant
Assistant Federal Public Defender
P.O. Box 595
Portland, Me 04112-0595
207-553-7070
FAX: 553-7017
Heather_gonzales@fd.org

## CERTIFICATE OF SERVICE

    I, Heather Gonzales, hereby certify that I have this date caused the within Sentencing Memorandum to be served upon Assistant United States Attorney David Joyce, Esq., by forwarding a copy to him via the Court's ECF System: david.joyce@usdoj.gov.


Dated: June 8, 2023                        /s/ Heather Gonzales
                                              Attorney for Defendant